IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

NO. __3:12-cv-00124-JFA_____

| | |
|---|---|
| CATAWBA RIVERKEEPER ) | |
| FOUNDATION, INC. ) | |
|  ) | |
| Plaintiff, ) | |
|  ) | |
| v. ) | |
|  ) | **COMPLAINT** |
| SOUTH CAROLINA ELECTRIC AND GAS ) | (JURY TRIAL DEMANDED) |
| COMPANY, A SUBSIDIARY OF SCANA ) | |
| CORPORATION ) | |
| Defendant. ) | |
| _____ ) | |

## NATURE OF THE CASE

1. This action challenges ongoing unlawful discharges of arsenic and other contaminants into waters of South Carolina without a permit by Defendant South Carolina Electric & Gas Company ("SCE&G"), in violation of the South Carolina Pollution Control Act, codified as S.C. Code § 48-1-10 et seq. This action also challenges the Defendant's efforts to exclude the people of South Carolina from their legally-guaranteed rights to participate in governmental decisions that apply to polluters, like the Defendant, who pollute South Carolina's waters, groundwater, and environment.

2. Defendant SCE&G is engaged in the generation, transmission, distribution, and sale of electricity to retail and wholesale customers. In 1970, SCE&G began operating the 700-megawatt Wateree Station coal-fired electricity generating plant in Richland County, SC.

1

3. For decades, SCE&G has been polluting South Carolina's waters, groundwater, and environment by discharging large quantities of arsenic and other pollutants from coal ash impoundments located on the banks of the Wateree River in southern Richland County, South Carolina. These impoundments are unlined, the coal ash is stored in a wet condition, and the impoundments contain over 2.4 million tons of coal ash.

4. Arsenic is a highly toxic substance and a known carcinogen.

5. SCE&G's coal ash impoundments are located in a rural area that includes communities of lower income people and minorities, including the Eastover community. The coal ash impoundments are also located upstream of South Carolina's only National Park, the Congaree National Park.

6. SCE&G's coal ash impoundments are located dangerously close to the Wateree River on its banks, such that a natural or man-made disaster, accident, or other failure of the impoundments would result in a catastrophic discharge of tons of coal ash into the Wateree River.

7. South Carolina's Pollution Control Act ("PCA") bars polluters from contaminating the waters, groundwater, and environment of South Carolina without a permit issued by the South Carolina Department of Health and Environmental Control ("DHEC"). The PCA thereby ensures that polluters who would contaminate the environment must first obtain a permit that includes conditions and terms set by DHEC. Further, the PCA ensures that people affected by the pollution, people who live near it, and the public of South Carolina will have an opportunity to participate in the decision whether their environment will be polluted and under what conditions. The PCA affords

these rights to the public through its permit requirement, the process for which includes public comment, public hearings, and judicial review.

8. In 2001, SCE&G entered into a private Consent Agreement with DHEC, which stated that SCE&G's pollution was unlawful and violated the PCA and groundwater quality standards. Because it did not require SCE&G to cease discharging pollutants from the ash ponds, the Consent Agreement has resulted in SCE&G continuing to discharge large quantities of arsenic and other pollutants into the waters, groundwater, and environment of South Carolina indefinitely. It also resulted in the continuing presence of millions of tons of coal ash in wet impoundments adjacent to the Wateree River. But this private Consent Agreement did not authorize—and under the PCA it could not have authorized—these ongoing discharges resulting from the storage of coal ash in unlined and leaking lagoons.

9. The Consent Agreement did not require SCE&G to take any action to stop polluting or to remediate its contamination of the waters, groundwater, and environment of South Carolina. It did not require SCE&G to move its coal ash away from the Wateree River. Further, because SCE&G entered into a private agreement instead of seeking a permit, it closed out of the process the people who live near the coal ash impoundments and near the Wateree River, the people of Eastover, the people of South Carolina, the Plaintiff, and its members. It blocked public comment, public hearings, and judicial review of the terms of the document that did not prevent continuing pollution by SCE&G.

10. This private Consent Agreement is not a permit under the PCA, and it did not afford the people who live near the coal ash impoundments and the Wateree, the

3

Eastover community, the Plaintiff, its members, and other members of the public the opportunity for participation or judicial review under the required permitting procedures of the PCA and the South Carolina Administrative Procedure Act ("SC APA"). Defendant SCE&G therefore continues to violate the PCA by discharging arsenic and other contaminants from its unlined coal ash impoundments into the groundwater and the Wateree River without a permit as required by the PCA, and the public has been shut out of the process.

## JURISDICTION AND VENUE

11.     Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.  Plaintiff is a North Carolina corporation with its principal place of business in North Carolina, and Defendant is a South Carolina corporation with its principal place of business in South Carolina.  This Court therefore has jurisdiction over this action pursuant to 28 U.S.C. § 1332 and jurisdiction over the parties.  Plaintiff has the right to bring this action for declaratory and injunctive relief under section 48-1-250 of the PCA.  *See Georgetown Cnty. League of Women Voters v. Smith Land Co.*, 713 S.E.2d 287, 289-90 (S.C. 2011).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

### The Catawba Riverkeeper Foundation and Its Members

13.     Plaintiff Catawba Riverkeeper Foundation ("CRF") is a § 501(c)(3) non-profit public interest organization operating in South and North Carolina.  CRF operates in the 24 counties of the Catawba/Wateree River watershed in South and North Carolina; the name of the river changes to the Wateree at Lake Wateree in South Carolina.  CRF has members in South and North Carolina.

14. CRF's mission is to "advocate[] for the health, protection and enjoyment of the Catawba River watershed" located both in South and North Carolina. CRF works to improve water quality through monitoring and conservation advocacy, and works to increase public awareness through education and partnerships with other community and conservation groups. CRF comments on permits, regulatory proposals, and government actions that affect the Catawba River watershed, including commenting on and participating in the public hearing on the most recent NPDES permit for Wateree Station. Such comments are an essential part of CRF's work and an important way that it carries out its mission. CRF thereby expresses the views of its members, Board, and staff, and also shares its expert knowledge and experience with the government agencies and applicants seeking permits or other governmental authorization or benefits. CRF's members also participate in this way, and CRF encourages its members to do so.

15. CRF and its members have been harmed by SCE&G's pollution of South Carolina's waters, groundwater, and environment. Members of CRF recreate, fish, and hunt on the Wateree River in the vicinity of and downstream from Defendant's Wateree Station. They fear contamination of wildlife and river water by discharges from Defendant's coal ash ponds containing arsenic and other pollutants. Members of CRF also enjoy visiting the Congaree National Park, the only National Park in South Carolina, which is located three miles downstream from Wateree Station. The Defendant's discharges of arsenic and other contamination from Wateree Station are reducing the use and enjoyment by Plaintiff and its members of the Wateree River and the Congaree National Park.

16. CRF and its members also have been damaged by being denied their right to participate in the decisions concerning SCE&G's pollution of South Carolina's waters, groundwater, and environment. If SCE&G had complied with the law, CRF would have commented on SCE&G's pollution of the Wateree River and the Catawba Watershed and the terms and conditions under which it is allowed to pollute, particularly CRF's concerns regarding the protection of important water resources and its expertise concerning them. Likewise, CRF's members would have commented on SCE&G's pollution of the Wateree River and the Catawba Watershed and the terms and conditions under which SCE&G is allowed to pollute. Further, a public hearing should have been held on these topics to obtain further information and to inform the public about the pollution and the effects on the Wateree River and the Catawba Watershed, and CRF and its members should have had an opportunity to attend and speak at such a hearing. CRF and its members should also have had an opportunity for judicial review of any permit, if the permit were issued with such terms and conditions that CRF and/or its members considered to be inappropriate for the health and benefit of the Wateree River, the Catawba Watershed, the environment of South Carolina, and the public.

17. As set forth above, CRF and its members have interests which have been and are adversely affected and irreparably harmed by SCE&G's ongoing violation of the PCA; and CRF and its members have been damaged by SCE&G's ongoing violation of the PCA. These actual and potential injuries and damages have been and continue to be caused by the illegal discharges from SCE&G's unlined coal ash impoundments into groundwaters of the State and the Wateree River. These injuries will not be redressed except by an order from this Court requiring Defendant to take immediate and substantial

action to stop the flow of ash into these impoundments, to empty the impoundments of all coal combustion byproducts, to move its storage of coal ash away from the floodway and floodplain of the Wateree River, to remediate the groundwater contamination at Wateree Station, and to comply with the other relief sought in this action. CRF and its members have also been harmed and damaged by their exclusion from the process, the lack of an opportunity for public comment and public hearings, and the lack of an opportunity for judicial review.

## STATUTORY BACKGROUND

18.    Under the PCA, it is "unlawful for any person, directly or indirectly, to throw, drain, run, allow to seep or otherwise discharge into the environment of the State organic or inorganic matter, including sewage, industrial wastes and other wastes, *except as in compliance with a permit issued by the Department*." S.C. Code § 48-1-90 (emphasis added). The PCA's definition of "the environment" includes waters of the State and groundwater. *Id.* § 48-1-10.

19.    The PCA's permitting requirements are further defined in Regulation 61-9.505. "The Land Application permit and State permit program requires permits for the discharge of pollutants from any source directly or indirectly into groundwaters of the State and to the land of the State." S.C. Code Regs. 61-9.505.1(b)(1) (2011). Section 505.21 provides, "Any person who discharges or proposes to discharge pollutants directly or indirectly to groundwaters of the State . . . shall submit a complete application to the Department in accordance with this section and R.61-9.124."

20.    Under the PCA, a permit is an "authorization, license, or equivalent control document issued by the Department to implement the requirements of this

7

regulation, 40 C.F.R. Part 123, and R. 61-9.124 . . . Permit does not include any permit which has not yet been the subject of final agency action, such as a draft permit or a proposed permit." S.C. Code Ann. Regs. 61-9.122.

21.     The PCA requires that the public be given the opportunity to participate in the permitting process before DHEC may authorize the discharge of pollutants into the environment of the State. Under the PCA, the public has the right to comment and request a public hearing on a proposed permit before it is issued and to seek judicial review after it is issued. S.C. Code §§ 48-1-100, 48-1-150, 44-1-60(G).

22.     The PCA requires public notice and the opportunity to comment before the Department may issue a permit. *See* S.C. Code § 48-1-100 ("If, *after appropriate public comment procedures*, as defined by department regulations, the department finds that the discharge from the proposed outlet or source will not be in contravention of provisions of this chapter, a permit to construct and a permit to discharge must be issued to the applicant") (emphasis added); S.C. Code Regs. 61-9.122.1(g)(10) (clarifying that section 48-1-100 "requires an opportunity for public comment before issuance of permits to discharge"). The PCA also allows citizens to request a public hearing prior to DHEC's issuance of a permit. S.C. Code § 48-1-150.

23.     After public notice, the opportunity for comment, and any public hearings granted by the Department, DHEC issues a "department decision." S.C. Code § 44-1-60(D). DHEC must give notice of its decision to "the applicant, permittee, licensee, and affected persons who have requested in writing to be notified." *Id.* §44-1-60(E)(1). Parties and affected persons are given fifteen days after notice of a department decision is mailed to request a final review conference. *Id.* §44-1-60(E)(2). If no request for a final

8

review conference is made within fifteen days of notice being mailed, the Department decision becomes the final agency decision. *Id.*

24.     Affected members of the public have a right to appeal a final agency permitting decision pursuant to the South Carolina Administrative Procedure Act, S.C. Code § 1-23, and the PCA: "An applicant, permittee, licensee, or affected person may file a request with the Administrative Law Court for a contested case hearing within thirty calendar days" after the board declines to hold a final review conference, the sixty-day deadline for a final review conference passes, or the agency decision resulting from the final review conference is received by the parties. S.C. Code § 44-1-60(G). Thereafter, a decision of the Administrative Law Court may be reviewed by the South Carolina Courts.

## FACTS

25.     SCE&G owns and operates Wateree Station, a 700-megawatt coal-fired electricity generating facility located on the Wateree River near Eastover, South Carolina. Wateree Station includes two adjacent coal ash impoundments of approximately 80 acres each, known as Ponds One and Two, which border the Wateree River and stretch almost one-half mile along the Wateree River. Both impoundments are unlined. SCE&G estimates that Pond One, which receives the waste stream from the power plant, contained approximately 2,426,214 dry tons of coal ash as of December 2011.

26.     The impoundments are adjacent to the Wateree River and separated from the river by a dike. The river has migrated west towards the impoundments since they were constructed in 1970, and the river bank has been stabilized with a variety of hard materials in an attempt to stop its erosion. As of 2010, the dike separating Pond One from the river was approximately 150 feet wide at its narrowest point.

27.     From 1999 to 2010, an average of 184,000 tons of coal combustion byproducts was produced at Wateree Station each year. SCE&G uses fabric filters known as baghouses to capture and collect fly ash for eventual sale to concrete manufacturers. The remaining wet ash is sluiced into Pond One, which serves as a settling pond. Other wastewater streams at Wateree Station are also directed to Pond One, including flue gas desulphurization ("FGD") blowdown, recirculated cooling tower blowdown, low volume wastes, storm water, runoff from large uncovered coal piles, and approximately five million gallons per year of liquid leachate that drains out of SCE&G's on-site industrial solid waste landfill ("ISWLF"). Water from Pond One is then piped into Pond Two for a second round of settling, called "finishing" or "polishing."

28.     Water from Pond Two is discharged through a ditch into the Wateree River pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit. The NPDES permit contains no effluent limitation for arsenic.

29.     The NPDES permit authorizes discharges into the Wateree River from Outfall 03A, the normal point source discharge into the Wateree River from Pond Two, and from Outfall 03B, which is an emergency point of discharge. The NPDES permit does not authorize discharges into the Wateree River from any other source. SCE&G and DHEC have stated repeatedly that the arsenic contamination caused by the coal ash impoundments is not covered or authorized by the NPDES permit. Indeed, none of the pollution addressed in this Complaint is covered or authorized by SCE&G's NPDES permit.

30.     The ash, leachate, and other waste streams directed to the ponds contain metals, including arsenic. When the ash comes into contact with water, these metals,

10

along with other contaminants, tend to leach or dissolve into the water. Arsenic levels that greatly exceed South Carolina's groundwater standards have been detected consistently in groundwater monitoring wells in the vicinity of the two ponds since 1997.

31. In 2001, SCE&G entered into a private Consent Agreement with DHEC. S.C. Electric and Gas Co., Consent Agreement #01-053-W (S.C. Dep't of Health and Envtl. Control 2001) (the "Consent Agreement"). The Consent Agreement does not require SCE&G to stop or correct its arsenic pollution or to move its coal ash away from the Wateree River, but instead requires only monitoring of its groundwater pollution. This monitoring has gone on for a decade.

32. The Consent Agreement also states that SCE&G has identified the two coal ash impoundments as the source of the groundwater contamination at Wateree Station. Consent Agreement at 2. Both a 1997 hydrogeologic assessment and SCE&G's Application acknowledge that groundwater from the site discharges into the Wateree River.

33. In the Consent Agreement, DHEC concludes as a matter of law that SCE&G has violated the Pollution Control Act, "in that it discharged arsenic into the environment without a permit from the Department." *Id.* at 4. DHEC also concludes that SCE&G has violated the South Carolina Water Classifications and Standards by failing to maintain groundwater quality in accordance with Class GB standards. *Id.* Class GB means that ground water is of such quality and quantity that it could or does supply water to a public drinking water system; the arsenic limit for Class GB waters is 10 parts per billion ("ppb"). S.C. Code Reg. 61-68 (2011).

34. SCE&G also signed the Consent Agreement.

35. The Consent Agreement mandates semi-annual groundwater monitoring and sets maximum mixing zone contaminant levels ("MZCLs") for each monitoring well. The MZCL for arsenic at monitoring wells 3, 4, and 11 is 3,000 parts per billion (ppb) – 300 times the legal limit – while the MZCL for the remaining wells is 50 ppb – 5 times the legal limit. Pursuant to the Consent Agreement, when SCE&G's sampling detects arsenic concentrations that exceed the MZCL, it must report the exceedence to DHEC and take a second sample. Should the arsenic concentration in the second sample fall below the MZCL, SCE&G is not required by the Consent Agreement to take further action.

36. The public, CRF, and its members were not given notice or the opportunity to submit comments to DHEC regarding this Consent Agreement and the elevated concentrations of groundwater contaminants it contains. The public, CRF, and its members were also denied the opportunity to request a public hearing or to appeal the Agreement's groundwater quality standards. The public, CRF, and its members were also denied the opportunity to comment on, to request a hearing concerning, or to seek judicial review of the failure to stop or remediate the arsenic contamination and pollution, to prevent it in the future, to require that it be moved away from the Wateree River, or to require that the coal ash be handled and stored in a way that does not pollute or contaminate the environment with arsenic, other toxic substances, and other pollutants.

37. In addition to contaminated water, arsenic, and other pollutants flowing and leaching from the unlined ash impoundments into the waters and groundwater of the State, the impoundments also spring leaks periodically and send streams of arsenic-contaminated water out of the riverbank and into the Wateree River. These streams are

sometimes called seeps, but they are water streams that create channels from the coal ash impoundments into the Wateree River. In 2009, SCE&G reported to DHEC that contaminated water was entering the Wateree River through seeps. One seep was observed to flow at approximately 10 to 20 gallons per minute ("gpm") and the other at approximately 1.5 gpm. Samples from the two seeps taken by DHEC contained arsenic concentrations of 1,900 ppb and 770 ppb respectively. In addition, surface water samples taken by DHEC from a wetlands area adjacent to Pond Two revealed iron concentrations that significantly exceeded the maximum concentrations allowed by state and federal law. The wetland sampling also detected an arsenic concentration of 9.2 ppb and zinc concentrations of 35 and 48 ppb—levels approaching the Criterion Maximum Concentration for these pollutants. The presence of these pollutants in wetlands that border the coal ash impoundments demonstrates that the ash ponds are discharging into these wetlands, which are waters of the State protected by the PCA.

38. A recent Administrative Law Court decision involving Wateree Station noted that a water quality expert had estimated that the combined effect of the groundwater contamination and the seeps would result in over a quarter-pound of arsenic entering the Wateree River every day (0.26 lbs/day). *Hill v. South Carolina Dept. of Health and Envtl. Control*, No. 08-ALJ-09-0183-CC, 08-ALJ-09-0534-CC, at ¶ 55 (S.C. Admin. Ct. Jan. 13, 2010). That is a rate of over 90 pounds of arsenic per year.

39. In legally-required filings with federal authorities, SCE&G has reported that in 2009 it disposed of 2,743,750 pounds of toxic substances at its Wateree facility, including, but not limited to, 3,124 pounds of arsenic compounds, 28,303 pounds of barium compounds, 5,286 pounds of chromium compounds, 7,749 pounds of manganese

13

compounds, 2,729 pounds of lead compounds, 4,762 pounds of nickel compounds, 7,554 pounds of zinc compounds, and 2,427,780 pounds of hydrochloric acid.  In 2010, SCE&G reported that it disposed of 1,606,509 pounds of toxic substances at its Wateree facility, including, but not limited to, 1,695 pounds of arsenic compounds, 11,556 pounds of barium compounds, 2,550 pounds of chromium compounds, 6,266 pounds of manganese compounds, 1,378 pounds of lead compounds, 2,268 pounds of nickel compounds, 3,889 pounds of zinc compounds, and 1,410,914 pounds of hydrochloric acid.

40. SCE&G has never obtained a permit to authorize its discharge of arsenic, contaminated water, and other pollutants into the waters and groundwater of the State from the coal ash impoundments or from locations other than those specified in the NPDES permit.

41. Today, SCE&G continues to operate Wateree Station without a permit for its ongoing discharges of arsenic and other contaminants from the coal ash impoundments into waters and groundwaters of the State.

42. The groundwater contamination beneath Wateree Station has increased during the 10-year history of the Consent Agreement.  Data from 1994 to 1999 indicate that arsenic concentrations in Monitoring Wells 7 and 11—the wells closest to the river—ranged from 579 ppb to 2,000 ppb with an average of 1,085 ppb – more than 100 times the legal limit.  However, arsenic concentrations in Monitoring Well-11 reached 5,100 ppb in 2006 and 4,051 in 2007 – more than 500 and 400 times the legal limit.  In both instances, a retest yielded levels below the 3,000 ppb limit in the Consent Agreement, and SCE&G was not required by the Consent Agreement to take any further action.

43. After almost a decade of monitoring, in a July 12, 2010 letter to SCE&G, DHEC noted that "a review of historical data indicates a slight *increasing* arsenic trend in MW-3 and MW-11" (emphasis added). DHEC also stated in the letter that "[i]t is the hope of the Department that potential future remedial efforts will reduce arsenic concentrations at the site."

44. SCE&G signed a private Memorandum of Agreement ("MOA") with DHEC on October 14, 2011. The MOA was not publicly announced, and the public, CRF, and its members played no role in the development of that MOA and had no opportunity to comment on or appeal it.

45. The MOA sets out an anticipated timeline in which SCE&G would transition to dry handling of fly ash by December 31, 2011; transition to dry handling of bottom ash by December 31, 2012; expand its Class 3 ISWLF to accommodate more coal ash by December 31, 2015; and complete its removal of ash from the ponds by January 1, 2022.

46. The MOA demonstrates that SCE&G's pollution of South Carolina's waters and groundwater with arsenic and other pollutants is a serious problem, that what SCE&G has been doing over the past decade has been ineffective in stopping and remediating this pollution, and that SCE&G is capable of storing its coal ash without placing it in the coal ash impoundments on the river and is capable of emptying the coal ash impoundments which have been polluting the waters and groundwater of the State for over 40 years. However, the private MOA – unlike a permit – contains no binding commitments. By its terms, the MOA may be terminated by either party upon 30 days' written notice.

15

47.     Also, by its own terms, the MOA would subject the State, the people of the State, CRF, its members, and the waters and groundwater of the State to yet another decade of arsenic and other pollution from SCE&G's coal ash impoundments and to yet another decade of dangerous risk from tons of wet coal ash stored in impoundments adjacent to the Wateree River.

48.     By not obtaining a permit as required by law and by using an undisclosed "Memorandum of Agreement," SCE&G has avoided public notice, public comment, an appeal to the DHEC Board, and judicial review of its pollution and the proposals to deal with its pollution.  Thereby, SCE&G has denied the public, CRF, and its members a voice in this very serious issue facing the State, its people, and its environment.

## CLAIM FOR RELIEF

**(Violation of the South Carolina Pollution Control Act – Discharge of pollutants into the environment of the State without a permit)**

49.     The allegations of the preceding paragraphs are incorporated by reference as if repeated and set forth herein.

50.     The PCA prohibits the discharge of pollutants into the waters, groundwaters, and environment of the State without a permit.  S.C. Code §§ 48-1-90, 48-1-10.  A permit under the PCA requires public participation in the form of notice and comment procedures as well as the opportunity to request a public hearing and obtain judicial review.  *Id.* at §§ 48-1-100, 48-1-150, 44-1-60(G).

51.     The Consent Agreement between DHEC and SCE&G is a private agreement, not a permit.  The Consent Agreement fails to satisfy the permitting requirements of the PCA, including the public participation requirements of §§ 48-1-100,

16

48-1-150, and 44-1-60(G).  The same is true of the nonbinding "Memorandum of Agreement."

52. SCE&G has never received a permit authorizing it to discharge arsenic and other contaminants from the unlined coal ash impoundments into the waters, groundwaters, and environment of the State, nor into the Wateree River from any source other than its NPDES-permitted outfall.  These continuing unpermitted discharges by SCE&G violate § 48-1-90 of the PCA.

53. The 2011 MOA demonstrates that SCE&G is capable of taking significant action to reduce the ongoing contamination of the groundwater and Wateree River.  However, the current agreement is non-binding, contains no enforcement mechanism, and results in SCE&G's coal ash continuing to leach arsenic and other toxic substances and pollutants from the unlined impoundments into the groundwater, waters, and environment of South Carolina for another decade, and does not require a permit or any public participation.  It also results in at least another decade of SCE&G storing tons of wet coal ash in impoundments dangerously close to the Wateree River.  Ten years have already passed since the Consent Agreement with absolutely no action on the part of SCE&G to remediate existing groundwater contamination.  Plaintiff, its members, the Wateree River, and South Carolina's environment cannot afford to wait another decade – or longer.

54. Further, as with the Consent Agreement and in violation of law, the public, CRF, and its members were excluded from and denied any opportunity to participate in the creation of the MOA.

17

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Issue a declaratory judgment stating that Defendant has violated the PCA with its ongoing unpermitted discharges of arsenic and other contaminants into the water, wetlands, groundwater, Wateree River, and environment;

B. Enter appropriate preliminary and injunctive relief to ensure that Defendant:

   a. Ceases disposal of all coal combustion byproducts in Ponds One and Two;

   b. Utilizes dry disposal of all new coal combustion byproducts from Wateree Station in an appropriately lined ISWLF facility outside the floodway and floodplain of the Wateree River, with appropriate monitoring;

   c. Removes all existing coal combustion byproducts from Ponds One and Two within a reasonable amount of time and stores them in an appropriately lined ISWLF facility outside the floodway and floodplain of the Wateree River, with appropriate monitoring;

   d. Prevents the flow of contaminated groundwater into the Wateree River;

   e. Prevents the coal ash impoundments from leaking, seeping, and flowing into the Wateree River; and

   f. Remediates the groundwater beneath Wateree Station resulting from its unpermitted discharges.

C. Award Plaintiff the costs of this action; and

D. Grant Plaintiff such further and additional relief as the Court deems just and proper.

THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

This the 12th day of January, 2012.

/s/ Frank S. Holleman III
Frank S. Holleman III
　Bar No. 1911
　fholleman@selcnc.org
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone:  (919) 967-1450
Facsimile:  (919) 929-9421

J. Blanding Holman IV
　Bar No. 9805
　bholman@selcsc.org
Southern Environmental Law Center
43 Broad Street, Suite 300
Charleston, SC 29401
Telephone:  (843) 720-5270
Facsimile:  (843) 720-5240

*Attorneys for Plaintiff*